**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| STATE OF NEW MEXICO, *ex rel.* HECTOR BALDERAS, Attorney General,<br><br>  Plaintiff,<br><br>v.<br><br>UNITED STATES NUCLEAR REGULATORY COMMISSION and UNITED STATES OF AMERICA<br><br>  Defendant | §<br>§<br>§<br>§<br>§<br>§  Civ. No. _____<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

## COMPLAINT FOR DECLARATORY JUDGEMENT AND PRELIMINARY INJUNCTION

**THE STATE OF NEW MEXICO,** by and through New Mexico Attorney General Hector H. Balderas ("New Mexico" or the "State"), files the foregoing Complaint against the above-named Defendants and in support thereof alleges as follows:

1.    New Mexico brings this action against the United States of America ("U.S."), acting through the United States Nuclear Regulatory Commission ("NRC"), (collectively "Defendants" or "NRC"), seeking a declaratory judgment and/or injunctive relief to force NRC's compliance with constitutional constructs, and with federal agency authorizing and regulating laws and suspend and enjoin proceedings violating same and thereby avoiding imminent and substantial endangerment to the people, environment and economy of the State of New Mexico.

2.    New Mexico specifically challenges the NRC's unlawful proceedings involving the Holtec International ("Holtec") application for a license to construct and operate a HI-STORE consolidated interim storage facility ("CISF") in Lea County and Eddy County, New Mexico, and

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

1

its decision to place the substantial costs of emergency preparation and response, as well as the costs for infrastructure improvements, on the State, Tribes and local communities bordering the undisclosed rail lines and roads, which will be used to ship high-risk, high-level nuclear waste to Holtec and from Holtec, on substantive, procedural and jurisdictional grounds.

3.      New Mexico similarly challenges the NRC's unlawful proceedings involving the Interim Storage Partners, LLC ("ISP") CISF in Andrews County, Texas and its decision to place the substantial burdens and costs of emergency preparation and response on New Mexico's infrastructure on substantive, procedural and jurisdictional grounds.

4.      New Mexico, like other states, has an obligation to protect the health, safety and welfare of its citizens.  It also plays "a special role in monitoring and improving federal agencies" implementation (action or inaction) of federal law, as well as ensuring such actions remain within constitutional boundaries, including but not limited to, the Tenth Amendment.

5.      The State of New Mexico seeks the Court's declaration of the parties' rights and duties pursuant to 28 U.S.C. § 2201.

## I.      THE PARTIES

6.      Plaintiff is the State of New Mexico, by the Honorable Hector H. Balderas, Attorney General of New Mexico, acting on behalf of itself, and as *parens patriae*, and as public trustee to protect the economic and environmental interests jeopardized by the unlawful actions of Defendants challenged herein.

7.      The Attorney General is authorized to act on behalf of the State in all actions when, in his judgment, the interests of the State require action, and is further empowered to appear before local, state and federal courts and regulatory officers, agencies and bodies, to represent and to be heard on behalf of the State when, in his judgment, the public interest of the State requires such action. N.M. Const. art. V § 1; NMSA 1978, § 8-5-2. Defendant NRC is a part of the Department

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

2

of Energy ("DOE") in the executive branch of the United States government. Also, Defendant is the United States of America ("U.S."), acting through the NRC.

## II.    JURISDICTION AND VENUE

8.     The Court has jurisdiction under the Declaratory Judgement Act, 28 U.S.C. § 2201, and the issues herein raise federal questions under 28 U.S.C. § 1331.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the proposed Holtec CISF is to be constructed in New Mexico. The responsibilities for emergency response equipment and training for transportation related accidents and infrastructure improvements necessary to accommodate the transport and storage of nuclear wastes at the proposed CISFs falls squarely on New Mexico, its Tribes and local communities; and the clear and present danger is to New Mexico's people, environment and economy. Although the proposed ISP facility is to be built in Texas, Defendants acknowledge that given its proximity to the border, it will be dependent on New Mexico water and emergency response services. The proposed ISP CISF also presents economic and radiological hazards to the State of New Mexico.  The NRC has also held, what few in person public meetings and hearings it has held, in New Mexico.

## III.    BACKGROUND

### A.  NRC's Authority

10.     The NRC's power is limited and the States fulfill their constitutional powers in our dual sovereignty by checking federal agency's abuse of its powers when it causes injury to a State and its citizens.

11.     The Administrative Procedure Act ("APA") is the primary law governing processes of federal administrative agencies. APA requires that affected persons be given adequate notice of proposed rules and an opportunity to comment on the proposed rules and in certain cases, the parties are given adequate opportunity to present facts and argument and the hearing officer is

impartial. The APA also provides standards for judicial review of agency actions, and provides for agency action to be set aside if found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law or in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.[1]

12.     The Atomic Energy Act ("AEA") of 1954, as amended, is the fundamental United States law on uses of nuclear materials.[2]  On the civilian side, it provides for both the development and regulation of the uses of nuclear materials and facilities, declaring the policy that "the development, use, and control of atomic energy shall be directed so as to promote world peace, improve the general welfare, increase the standard of living, and strengthen free competition in private enterprise."[3]

13.     The NRC was established by the Energy Reorganization Act of 1974 to ensure the safe use of radioactive materials for beneficial civilian purposes while protecting people and the environment.[4] Any Commission action under the AEA must conform to the AEA's procedural requirements, which provide an opportunity for hearings and federal judicial review in many instances.

14.     The NRC and the DOE share technical information and expertise as well as regulatory responsibility in the context of nuclear materials.

15.     The NRC is also subject to the Freedom of Information Act ("FOIA"), which requires federal government agencies make public their rules, adjudicatory decisions, statements of policy, and any instructions to staff that affect a member of the public.[5]  FOIA also requires

---

[1] 5 U.S.C. §§ 706(2)(A) and (C).
[2] The Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011 *et seq.*
[3] *See* NRC Website, Governing Legislation, *available at*: https://www.nrc.gov/about-nrc/governing-laws.html (Last accessed on March 25, 2021).
[4] 42 U.S.C. § 5841.
[5] 5 U.S.C. § 552.

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

4

federal government agencies to make public, upon request by interested parties, any materials that do not fall into a FOIA exception category.[6]

16.     The Sunshine Act requires that collegial bodies, such as Defendant NRC, hold their meetings in public.[7]

17.     The National Environmental Policy Act of 1969 ("NEPA")[8] mandates agencies prepare an environmental impact statement ("EIS") before undertaking any "major Federal actions significantly affecting the quality of the human environment."[9]  NEPA imposes a duty on agencies, like Defendant NRC, to take a "hard look at environmental consequences," "consider every significant aspect of the environmental impact" and "inform the public" of its analysis and conclusions for a proposed action.[10]

18.     Serving as an important Congressionally mandated check for a broad array of actions, agency EIS documents demand transparency and accuracy. To hastily base decisions on information that has not been independently verified for reliability and completeness or otherwise insulate material information from the public regarding the cumulative environmental and regional impacts of a proposed project, violates the governing public participation principles of NEPA.

19.     Under NEPA, EIS documents must be site-specific and evaluate the cumulative impacts of a proposed project, including "consideration of major points of view concerning the environmental impacts of the proposed action and the alternatives, and contain an analysis of

---

[6] *Id.*
[7] 29 C.F.R. Part 1612.
[8] The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*
[9] 43 U.S.C. § 4332(2)(c) (Including a detailed statement by the responsible official on "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.")
[10] *Balt. Gas & Elec. v. Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97, 103 (1983) (quoting *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 553 (1978)).

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

5

significant problems and objections raised by other Federal, State, and local agencies, by any affected Indian Tribes, and by other interested parties."[11]

20.     Further, under NRC's own NEPA implementing regulations, EIS documents require a discussion of the proposed project's cumulative effects, defined as "the impact on the environment. . .result[ing] from the incremental impact of the *action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions*."[12] Here, among other things it is reasonably foreseeable that a permanent repository with high-risk high-level radioactive waste will not be licensed or established, and the proposed CISFs will turn into *de facto* permanent storage facilities to the detriment of the State of New Mexico and its people. Cumulative effects, synonymous with cumulative impacts, can result from individually minor but collectively significant actions taking place over a period of time.[13]

21.     According to its website, the NRC "regulates commercial nuclear power plants and other uses of nuclear materials . . . through licensing, inspection and enforcement of its requirements."[14] These requirements necessarily include: an independent NRC assessment and investigation into material representations of potential licensees, a finding that the proposed site is suitable for intended use(s) based on collaboration and consultation with regional experts and a determination of compliance with all applicable state and federal laws, including but not limited to the APA, AEA, NEPA and the Nuclear Waste Policy Act of 1982 ("NWPA"),[15] as well as New

---

[11] 40 C.F.R. § 1508.7; Council on Environmental Quality ("CEQ") Regulations.
[12] *Id.* (emphasis added).
[13] *See* Holtec DEIS at 5-1 (identifying "potash mining, oil and gas production, other nuclear facilities, and wind and solar farms" as actions considered in its alleged cumulative analyses.)
[14] *See* NRC Website, About NRC, *available at:* https://www.nrc.gov/about-nrc.html (Last accessed on March 25, 2021).
[15] The Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101 *et seq.*

Mexico's Water Quality Act, N.M.S.A. §§ 74-6-1 *et seq.* (1978), New Mexico's Radiation Protection Act, N.M.S.A. §§74-3-5 and 74-3-9 (1978) and New Mexico's Radioactive and Hazardous Materials Act N.M.S.A. §§ 74-4A-1 and 74-4A-7 (1978).

22.      The NWPA was enacted in 1982 as Congress's attempt to solve the nation's rapidly amassing high-level nuclear waste storage problems.  Under the NWPA, the DOE is the federal agency tasked with establishing a suitable location for a permanent geologic repository to dispose of high-level radioactive waste and spent nuclear fuel ("SNF") indefinitely deep below the surface. The idea of placing the waste and SNF in deep, stable geological formations mirrors the international consensus on such matters and Congressional will. At its core, the intent and foundational structure of NWPA, assigns multiple federal agencies with overlapping responsibilities, including transportation, in establishing a permanent solution for the disposal of the nation's nuclear wastes, and it also requires engagement with and the consent of the hosting and sending entities.

23.      Pursuant to NWPA, DOE is precluded from taking title to SNF unless and until a permanent repository has opened.[16]  No permanent repository currently exists, little progress has been made in the past decade and the funding to establish same has been drastically cut.

24.      The NRC is exceeding its statutory jurisdiction and Congressionally delegated authorities and/or limitations in jeopardizing the economy and environment of New Mexico, its Tribes, its local governments and its citizens and is acting *ultra vires* in conducting costly but shallow proceedings to license the proposed Holtec and ISP CISFs, in violation of the APA and NWPA, and to the detriment of the State.  Contrary to the objectives of the AEA to improve general welfare and the standard of living, the NRC's licensing of the proposed CISFs would expose

---

[16] 42 U.S.C. §§ 1022(a)(5)(A), 10143.

individuals along undisclosed routes to multiple rounds of nuclear waste transport, compounding risks. While the two entities competing for CISF licenses stand to lucratively profit at the expense of the State, its communities and its future generations.

**B.     The Proposed CISFs**

25.     On March 30, 2017, Holtec submitted an application, including a Safety Analysis Report ("SAR"), Environmental Report ("ER"), and proposed license, requesting that the NRC grant Holtec a license for the construction and operation of a CISF for SNF.[17]

26.     The proposed CISF would be located in Eddy County and Lea County, New Mexico. In its license application, Holtec requests initial authorization to store up to 8,680 metric tons of uranium ("MTUs") in up to 500 canisters for a license period of 40 years.[18]

27.     Holtec anticipates, and the NRC is investigating its current application with an eye towards, future expansion of on-site storage up to 10,000 canisters containing 100,000 MTUs over the course of 60 years.[19]

28.     The NRC published a notice in the Federal Register regarding the acceptance and docketing of Holtec's CISF license application.[20] The NRC subsequently published a *Federal Register* notice of opportunity to request a hearing and to petition for leave t intervene.[21]  Multiple petitioners filed hearing requests and petitions to intervene.[22]

---

[17]  Holtec's application materials are available at: https://www.nrc.gov/waste/spent-fuel-storage/cis/holtec-international.html  Citations to the proposed license are to Revision 1 (ML 17310A223) (Proposed License), citations to the Safety Analysis Report (SAR) are to Revision  0H (ML 19163A062), and citations to the Environmental Report (ER) are to Revision 7 (ML 19309E337).
[18]  Proposed License at 1.
[19]  ER at 1-1.
[20]  Holtec International HI-STORE Consolidated Interim Storage Facility for Interim Storage of Spent Nuclear Fuel, 83 Fed. Reg. 12,034 (Mar. 19, 2018).
[21]  Holtec International HI-STORE Consolidated Interim Storage Facility for Interim Storage of Spent Nuclear Fuel, 83 Fed. Reg. 32,919 (July 16, 2018).
[22]  The other petitioners are: Alliance for Environmental Strategies; Beyond Nuclear, Inc.; NAC International Inc.; Sierra Club; and a group of joint petitioners led by Don't Waste Michigan.

29.     ISP has similarly submitted an application and licensing documents to the NRC to construct and operate a CISF for SNF in Andrews County, Texas, directly adjacent to the southeast New Mexico border.[23]

30.     The proposed ISP CISF is projected to house up to 40,000 MTUs for a period of at least 60 years.[24] If the NRC licenses the CISF in excess of these proposed terms, the State will experience potential increased risks to its surface water, groundwater and playas, as well as heightened threats of subsurface degradation and subsidence[25] and even greater strain on its emergency response resources.

31.     The predicate of both CISF applications is that the DOE will take ownership of the waste (after a future but unknown change in the law) and contract with Holtec and ISP to store it until disposal at a permanent repository becomes available.[26]

32.     For good reason, the NWPA of 1982, 42 U.S.C. §§ 10101, *et seq.*, as amended, does not authorize DOE to take title until a permanent repository is available. The Defendants nevertheless are going forward to license an illegal activity, which this Court should declare to be illegal.

33.     There is no good explanation for NRC's disregard for the NWPA. Clearly, NRC's job is not to create a political policy alternative to the status quo, or to second guess Congress.

---

[23]   ISP application and licensing documents are available at: https://www.nrc.gov/waste/spent-fuel-storage/cis/wcs/wcs-app-docs.html.

[24] Environmental Impact Statement for Interim Storage Partners LLC's License Application for a Consolidated Interim Storage Facility for Spent Nuclear Fuel in Andrews County, Texas, Draft Report for Comment, NUREG-2239 (May 2020) (ADAMS Accession No. ML20122A220), herein after "ISP DEIS."

[25] *See,* Rebecca Roose (New Mexico Environment Department, Water Protection Division) Letter to NRC (Dec. 16, 2019).

[26] Holtec also has a decommissioning business in which it also expects DOE to take title to the SNF. *See e.g.,* Holtec Palisades (Michigan) Post Shutdown Decommissioning Activities Report (PSDAR), p. 43, (page 90/98 on PDF counter):

> Palisades Spent fuel management plan is based in general upon: 1) a 2030 start date for DOE initialing transfer of commercial spent fuel to a federal facility (not necessarily a final repository), and 2) expectations for spent fuel receipt by the DOE for the Palisades fuel beginning in 2030. All spent fuel expected to be removed from the site by 2040.

34.     The NWPA and the International Atomic Energy Agency ("IAEA") support the use of deep geologic repositories for the safe storage and/or disposal of SNF and high-level radioactive waste.[27]  The Act establishes procedures to evaluate and select sites for geologic repositories and for the interaction of State and federal governments.  It also provides a timetable of key milestones the federal agencies must meet in carrying out the program.

35.     The NWPA assigns the DOE the responsibility to site, build, and operate a deep geologic repository for the disposal of high-level waste and SNF.  It directs the Environmental Protection Agency ("EPA") to develop standards for protection of the general environment from offsite releases of radioactive materials in repositories.  The Act further directs the NRC to license DOE to operate a repository only if it meets EPA's standards and all other relevant requirements.

36.     Congress has amended the NWPA with clear directives to DOE, including:

- Directing DOE to consider Yucca Mountain as the primary site for the first permanent geologic repository;[28]
- Prohibiting DOE from conducting site specific activities at a second site unless authorized by Congress;[29]
- Requiring the Secretary of Energy to develop a report on the need for a second repository no later than January 1, 2010;[30] and
- Establishing a commission to study the need and feasibility of a monitored retrievable storage ("MRS") facility.[31]

37.     No one disputes that the DOE has failed for decades to implement Congress's non-discretionary objective to address and resolve the long-term storage of high-risk, high-level radioactive waste by creating a permanent geologic disposal repository.

---

[27] *See e.g.*, 42 U.S.C. §§ 10101 *et seq.;* IAEA Safety Standards for Protecting People and the Environment, Disposal of Radioactive Waste - Requirement 9: Isolation of Radioactive Waste (2011); *available at:* https://www-pub.iaea.org/MTCD/publications/PDF/Pub1449_web.pdf.
[28] 42 U.S.C. § 10134.
[29] 42 U.S.C. § 10135.
[30] 42 U.S.C. § 10172(b).
[31] 42 U.S.C. § 10161(b).

38.     NRC has repeatedly made public statements as to the cancellation of licensing the Yucca permanent repository. In October of 2020, the Commission approved a request to substantially curtail spending associated with the licensing of a permanent repository. As stated by NRC Chairman himself, the "NRC [has] provided limited program planning and support and continued management activities" recently for Yucca's licensing application.[32]

39.     Yet the NRC (and CISF applicants) unjustifiably rely on the assumption and pre-determination that a permanent repository will be built by 2048. This claim is without merit and threatens to render the proposed CISFs permanent *de facto* storage facilities without the safeguards and assessment of impacts of a permanent facility.

40.     The NRC has never been authorized to act in the place of Congress or to attempt to create new policy "options."

41.     The NRC has never been authorized under NWPA to create unfunded mandates for State and local governments or to otherwise ignore the interest of the statewide citizens of New Mexico.

42.     The NRC has never been explicitly authorized under any legislative mandate to license a CISF and the term "consolidated interim storage facility" is not defined and the NRC-created licensing term appears nowhere in its promulgated regulations. *See e.g.,* 10 C.F.R. Part 72 (defining licensing requirements for MRS and independent spent fuel storage installation ("ISFSI") facilities).

43.     Contrary to NRC's assertions and attempts to re-brand and re-work its existing regulations to fit its desired outcome, "consolidated interim storage facilities" are not ISFSIs or

---

[32] C. Hanson (NRC) Letter to Honorable Frank Pallone, Jr. (March 1, 2021) (disclosing a mere $4,813 in expenditures for January 2021 to address the remand by the U.S. Court of Appeals for District of Columbia Circuit in the case *In re Aiken County*).

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

11

MRS facilities. *Id.* MRS facilities are intended to be operated by the government, not private businesses like Holtec and ISP.[33] The creation of DOE operated MRS facilities, pursuant to NWPA, also contemplates consent and cooperation of the hosting site and cannot be constructed until the NRC "has authorized the construction of a repository" for ultimate disposal.[34] An MRS facility site is also limited to maximum of 15,000 MTUs at any one time (a fraction of the proposed MTUs to be stored at the proposed Holtec CISF site).[35] Likewise, the regulations governing ISFSIs were intended to provide the framework for multiple reactor-related interim storage facilities across the country for the private nuclear generators and owners to temporarily store limited amounts of waste at or away from reactors until a permanent repository could be established.

44.     ISFSIs were envisioned as "independent" facilities not the colossal "consolidated" facility proposed by Holtec, which anticipates storing waste from virtually every existing reactor across the country, and without a solid plan for the entities responsible and/or liable for the massive undertaking of transporting the entire nation's high-risk, high-level waste from reactors nationwide, through extensive industry operations in the Permian Basin, to and from the proposed site in New Mexico. This crucial transportation disconnect aptly demonstrates why the proposed Holtec "consolidated" facility is not contemplated by any underlying legislation and regulations and why NRC is acting in excess of its statutory and delegated authority. Surely Congress did not intend for NRC to leave the crucial questions of responsibility and liability for transport of nuclear waste unanswered and unexamined.

---

[33] *See e.g.,* 10 C.F.R. § 72.3 (defining MRS facility as one "operated by DOE for the receipt, transfer, handling, packaging, possession, safeguarding, and storage of [SNF] for at least one year, solidified high-level radioactive waste resulting from civilian nuclear activities, and solid reactor-related GTCC waste. . .").
[34] *Id.*
[35] 10 C.F.R. § 72.44(g)(4).

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

12

45.     In light of its aggressive promotion of the use of nuclear power (which in turn generates new high-level waste requiring long term storage and/or disposal), NRC has begun to promote the idea of long term consolidated interim storage of high-level radioactive waste in New Mexico, without its consent or consideration, when the State itself has no operating nuclear power plant. See below.

## Licensed and Operating Independent Spent Fuel Storage Installations by State



▲ ISFSI site-specific license (15)
● ISFSI general license (65)
▦ 35 States have at least one ISFSI

**ALABAMA**
● Browns Ferry
● Farley

**ARIZONA**
● Palo Verde

**ARKANSAS**
● Arkansas Nuclear

**CALIFORNIA**
▲ Diablo Canyon
▲ Rancho Seco
● San Onofre
▲ Humboldt Bay

**COLORADO**
▲ Fort St. Vrain

**CONNECTICUT**
● Haddam Neck
● Millstone

**FLORIDA**
● Crystal River
● St. Lucie
● Turkey Point

**GEORGIA**
● Hatch
● Vogtle

**IDAHO**
▲ DOE: Three Mile Island-2
    (Fuel Debris)
▲ DOE: Idaho Spent Fuel Facility ✱

**ILLINOIS**
● Braidwood
● Byron
● Clinton
▲ GEH Morris (Wet)
● Dresden
● La Salle
● Quad Cities
● Zion

**IOWA**
● Duane Arnold

**LOUISIANA**
● River Bend
● Waterford

**MAINE**
● Maine Yankee

**MARYLAND**
▲ Calvert Cliffs

**MASSACHUSETTS**
● Yankee Rowe
● Pilgrim

**MICHIGAN**
● Big Rock Point
● Palisades
● Cook
● Fermi

**MINNESOTA**
● Monticello
▲ Prairie Island

**MISSISSIPPI**
● Grand Gulf

**MISSOURI**
● Callaway

**NEBRASKA**
● Cooper
● Ft. Calhoun

**NEW HAMPSHIRE**
● Seabrook

**NEW JERSEY**
● Hope Creek
● Salem
● Oyster Creek

**NEW YORK**
● Indian Point
● FitzPatrick
● Ginna
● Nine Mile Point

**NORTH CAROLINA**
● Brunswick
● McGuire

**OHIO**
● Davis-Besse
● Perry

**OREGON**
▲ Trojan

**PENNSYLVANIA**
● Limerick
● Susquehanna
● Peach Bottom
● Beaver Valley
● Three Mile Island

**SOUTH CAROLINA**
●▲ Oconee
●▲ Robinson
● Catawba
● Summer

**TENNESSEE**
● Sequoyah
● Watts Bar

**TEXAS**
● Comanche Peak
● South Texas Project

**UTAH**
▲ Private Fuel Storage ✱

**VERMONT**
● Vermont Yankee

**VIRGINIA**
●▲ Surry
●▲ North Anna

**WASHINGTON**
● Columbia

**WISCONSIN**
● Point Beach
● Kewaunee
● LaCrosse

✱ Facility licensed only, never built or operated. Alaska and Hawaii are not pictured and have no sites. Data are current as of June 2019. NRC-abbreviated site names listed. For the most recent information, go to the Dataset Index Web page at *https://www.nrc.gov/reading-rm/doc-collections/datasets/.*


U.S.NRC
United States Nuclear Regulatory Commission
*Protecting People and the Environment*

As of August 2019

46.     The NRC is ignoring its obligation to be policy neutral, ignoring the stark absence of CISF specific regulations and instead recommending and attempting to drive bad policy, including storage just below ground level in a highly unstable geologic area riddled with sinkholes, subject to fracking below the surface and nearby potash mining, that experiences increasing frequency and magnitude of earthquakes, and contains the remnants of a prior nuclear bomb test.

47.     Defendants' actions and lack of transparency jeopardize the sovereignty of New Mexico by impeding its ability to regulate and secure the health and welfare of the State's environment, people and economy. In considering the licensing of the proposed CISF projects in the absence of proper investigations and with a lack of full disclosure as to potential cumulative and long-lasting impacts on surrounding and competing land uses and substantial costs to the State to ensure the safety of its people and water resources from radiological injury in transport and long-term and/or indefinite storage. Indeed, the State has already expended significant time and resources in attempting to educate the NRC with its regional expertise on these issues, which has fallen on deaf ears.

48.     As noted in the Governor's letter to the NRC, Ex. 1, the "proposed site is geologically unsuitable. . .in an area that is underlain by concerns for sinkhole development and shallow groundwater, a precious resource" of the State and further "does not provide deep geologic isolation for indefinite [SNF] storage" and is "unsuitable. . .for storage over a period of decades."[36]

49.     Multiple State agencies have expressed these concerns to the NRC, in addition to objecting to the placement of a nuclear storage site in the middle of the Permian Basin, "one of the world's most productive oil and gas regions" with "[n]early 2,500 oil, gas and mineral wells or sites operated by 54 different businesses or entities within a 10 mile radius," and more specifically,

_____

[36] New Mexico Governor Michelle Lujan Grisham Letter to NRC (Sept. 22, 2020) (ML20269A025), Ex. 1.

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

15

with State subsurface mineral ownership and a lack of restrictions on mineral development at the site.[37] Ex. 2.

50.     The Permian Basin and its production are deemed essential for national security at this time. As such, it also becomes a target for terrorists. A release of radioactive material would likely render its potential outputs as worthless.

51.     A multitude of entities have expressed objections to multiple rounds of SNF transport, which creates "unnecessary risks to public health, safety and the environment" and places a heavy burden on the infrastructure of the State and its resources.[38] Ex. 3.

52.     New Mexico government in order to exercise its sovereignty must have the authority to enforce, and to protect the enforceability of its laws and self-government in court, State elected officials have strong political and institutional obligations, as well, as incentives to respect State constituent preferences.

53.     New Mexico, as the receiving State with all of the burdens and without benefits, opposes NRC's licensing of the proposed Holtec and ISP CISFs.

54.     Of significance, several states with facilities sending the nuclear waste also oppose NRC's improper use of exemptions as to decommissioning funds, questioning Holtec's lack of financial qualifications or assurances and inexperience in decommissioning facilities and associated license transfers of nuclear plant facilities.[39]

---

[37] *See e.g.,* Stephanie Garcia Richard (New Mexico State Land Commissioner) Letter to NRC (Sept. 22, 2020) (ML20269A003), Ex. 2.

[38] *See e.g.,* Dennis McQuillan (New Mexico Environment Department, Science Coordinator) Letter to NRC (Sept. 22, 2020), Ex. 3.

[39] *See e.g.,* 10 C.F.R. § 72.22 (requiring sufficient information to demonstrate applicant "either possesses the necessary funds, or that applicant has reasonable financial information assurance of obtaining [same]."; *see also,* 10 C.F.R. § 72.30 (requiring reasonable financial assurances as to decommissioning funds).

55.     In addition to changing or attempting to change the rules, NRC has colluded with Holtec's request for an illegal storage permit,[40] in rubber-stamping the dangerous and untested long-term storage (of at least 60 years) in an unstable geological area that jeopardizes the State's environment and economy, including but not limited to the oil and gas industry around the Permian Basin, their property and drilling rights, and the local agricultural industry.

56.     The NRC's actions further burden New Mexico, its local government, its Tribes, its people and its environmental justice communities by requiring it to spend money, for at the very least 60 years (and possibly longer, if not permanently), to respond with appropriately trained and equipped personnel, and to provide specialized medical facilities and infrastructure to address any emergency issues involving an accident (or simply cask degradation) during the movement of high-risk high-level radioactive waste by road or rail through New Mexico, once, from moving these waste from other states to New Mexico and, again from moving the waste to a permanent disposal repository.  This unnecessary, repeated, multiple legged, cross-continental transport of high-risk, high-level radioactive waste also especially and disproportionately burdens local governments and the environmental justice of communities.

57.     Moreover, NRC approval of the ISP CISF will compound those burdens as New Mexico's emergency services, firefighters, and water resources are in closest proximity to the west Texas site, and will be relied on in the event of radiological contamination or incident.[41]  As noted by the New Mexico League of Women Voters' comments in opposition to the CISF, Ex. 4:

---

[40] *See e.g.,* Docket ID NRC-2016-0231; NRC's ISP/WCS CISF DEIS (re NRC's Collusion with Holtec and ISP on CISFs).

[41] *See* ISP DEIS at 4-72 ("Eunice is located 8 km [5mi] from the proposed CISF and may be the first off-site responders to an incident at WCS or the proposed CISF" and in the "event of a catastrophic fire," in addition to Andrews County services, the Eunice Police in New Mexico, the New Mexico State Police, the Eunice Fire Department, the Carlsbad Medical Center in Carlsbad, New Mexico, and/or Lea Regional Medical Center in Hobbs, New Mexico will render assistance.)

[T]he NRC needs to determine who will be responsible for transporting the SNF to the CISF and who will be responsible for ensuring that the regulations have been met. . .[A]ccident conditions and preparatory training of Emergency Response personnel would both greatly impact SE NM resources. . . [and] [t]he nearest residences are. . .west of the proposed CISF project area near Eunice, New Mexico. The close proximity of these two facilities increases risks to residents of Eunice, NM and other nearby areas.[42]

58.     NRC has made a mockery of the public participation required for the licensing process.  Almost every interested party filing a challenge in NRC CISF proceedings has been denied standing and an opportunity to meaningfully participate.  And prospective parties with standing have had their contentions so narrowly interpreted or misconstrued to ignore the merits and re-frame the issues to facilitate NRC's rejection based on the information being previously known and deeming all filings as untimely and/or outside the scope. These facts underscore the result-oriented process created to achieve NRC's desire to license a series of CISFs in lieu of creating a permanent repository as dictated by Congress.

59.     As of this date, NRC has not allowed a single contention to be raised by any governmental, tribal or private opponent in New Mexico challenging NRC's handling of the either CISF matter.[43]  This total denial of non-party rights is unprecedented, and combined with the terrible misrepresentations and deficiencies in Holtec's submittals, strongly suggests collusion between the NRC and the proponents of Holtec's CISF in New Mexico.  The situation is no different at ISP.

60.     NRC made up its mind to support Holtec and CISFs a long time ago. In or around 2016 during pre-licensing meetings with CISF applicants, the NRC jumped on board with a plan to delink consolidated storage from Yucca and a permanent repository and not get "pigeon-holed"

---

[42] League of Women Voters of New Mexico Letter to NRC (Nov. 3, 2020) (ML20309A990) at pp. 8, 9 and 16, Ex. 4.
[43] *See e.g.,* LBP-19-74 (2019); LBP-19-11 (2019); LBP-20-06, (2020), affirmed CLI-20-0413, 921 NRC__ (4/23/20).

with consent of the communities housing such facilities. This pre-determination and real collusion ignore NRC rules and eviscerate NEPA's "hard look" requirement.

61.     NRC strategy for denying contentions to the proposed CISFs includes first, narrowly interpreting and misconstruing them so as to mischaracterize the issues raised, and then finding the re-framed contentions to be based on "facts" previously available to the non-parties, while at the same time ignoring the changing and ever-evolving nature of Holtec's "facts."

62.     In many instances the contentions raised by interested parties prompted NRC personnel to request additional information ("RAI") from Holtec which were made public only after non-party deadlines to challenge ERs, SARs, the DEIS, and other licensing documents. This lack of transparency and insulation of material information can only be explained by NRC's total disinterest in public comments or any scrutiny.

63.     NRC has been too lenient on CISF omissions, conjecture and the ever-changing nature of their proposed and very dangerous operations, and failed to consider whether Holtec or ISP can be trusted to manage their prospective CISF licenses.

64.     For example, statements made in a recent letter by XTO Energy Inc., a subsidiary of Exxon, reveal it possesses superior property rights at the proposed site and also asserts that oil and gas lessees were not given notice and were not appropriately involved or even considered in the Holtec DEIS. Holtec attempted to mislead the public by claiming that all subsurface owners consented, and it got caught.

65.     Holtec's persistent attempts to mischaracterize alleged land use restrictions and/or agreements proscribing local industries at and around the proposed CISF site have also been called out and clarified by the State Land Office. Contrary to Holtec's assertions that nearby potash mining and oil and gas activities will cease or somehow be limited to certain drilling depths and

drilling islands, the State Land Office, which retains the sole authority to approve any such impingement on subsurface mineral right leases, has not granted any purported Holtec agreement.[44] And valuable resources exist at shallow depths below the surface at and around the proposed site.

This is unacceptable and violates the primary principles of consent-based siting mandated by Blue Ribbon Commission ("BRC")[45] and NRC's duty to independently verify the accuracy of information provided by potential licensees.  It also threatens the State's economy. Oil and gas leases reflect property rights which the State protects.  Otherwise businesses would not invest in the State.

66.     The NRC's mandate does not include policy setting or altering the public debate and emphatically cheerleading nuclear industry projects.  Yet it is doing both to the detriment of New Mexico.

67.     The NRC and license applicants have openly acknowledged that any proposed CISF facility with the DOE taking title and transporting the nuclear waste without a permanent repository in place will violate the NWPA as currently legislated. As evidenced in pre-licensing meetings and its rulings in the Holtec proceedings, the NRC (and CISF license applicants) are banking on future legislative changes to allow the DOE to enter into temporary storage contracts with the proposed CISFs, including Holtec, a company with an extremely questionable history and extremely questionable present[46] as reflected in its various misrepresentations alleged herein.

---

[44] *See* Stephanie Garcia Richard (New Mexico State Land Commissioner) Letter to NRC (Sept. 22, 2020); *see also,* Stephanie Garcia Richard (New Mexico State Land Commissioner) Letter to NRC (July 2, 2019), Ex. 5.

[45] Blue Ribbon Commission. Report to the Secretary of Energy (Jan. 2012).

[46] *See also,* Maxwell papers for special investigation of Eddy-Lea Energy Alliance ("ELEA"), a government-owned Limited Liability Company, (Before the Office of the State Auditor of New Mexico Special Investigations Division) (July 17, 2019) (alleging collusion between Holtec and ELEA to manipulate competitive process for public bid in favor of Holtec).

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

20

Along the same lines, the NRC has determined that whether or not ownership and transportation of the nuclear waste by plant owners is a "commercially viable" option is not an issue before it. In short – the NRC will stop at no cost to find work-arounds and is running a public narrative of unfettered support for the approval of CISFs, despite its lack of explicit authority to license same and despite its lack of knowledge as to necessary transport of SNF to the site.  This raises the legitimate concern that NRC is not putting public health and safety first.

68.     The NRC's licensing, which excludes any analysis of the realistic impacts and instead relies on speculative changes to the law, also raises legitimate cost concerns for the State. As the NRC's DEIS, for the first time disclosed that the economic burden and responsibilities for emergency training, equipment and response, and infrastructure improvements related to the transport of nuclear waste, through extensive industry operations in the Permian Basin to the proposed site, were being shifted to State, local and tribal governments.

69.     More troubling, the NRC is spending more time, money and resources in licensing a CISF than finding a suitable permanent repository. Contradictorily, during each of the NRC call-in sessions discussing CISFs, the NRC's Environmental Review Project Manager, James Park, has read the following bullet points outlining the NRC's Review Process and policies during the NRC slide show introductory presentation, Ex. 6, attached hereto:

- Evaluate the application and determine if a license can be issued.
- *Not to promote* Holtec's proposal or the *Consolidated Interim Storage Facility (CISF) concept*.[47]

70.     Disregarding its own policies, at its late 2015 Division of Spent Fuel Management RegCon (Regulatory Conference), NRC's Tony Hsia, Acting Director of the Division of Spent

---

[47] *See, e.g.,* NRC Presentation Slides (July 9, 2020) (ML20225A100), *available at:* https://www.nrc.gov/docs/ML2022/ML20225A100.pdf (emphasis added), Ex. 6.

Fuel Management, in his closing remarks concluded the two-day symposium with a pep rally cry for CISFs. He passionately called for industry and NRC (as well as DOE, and other nuclear establishment players) to work together ("(If we) all work together, we can make it [centralized interim storage] happen!"), to open a *de facto* permanent storage facility like the presently proposed Holtec CISF in New Mexico.  He even pumped his fist in the air when he did so.  Such advocacy in favor of the proposed CISFs, by a senior NRC manager was incredibly inappropriate. Defendants did nothing to correct this gross misconduct.

71.    NRC Staff, as well as the Atomic Safety and Licensing Board ("ASLB") Panel, and even NRC Commissioners, have consistently demonstrated in a variety of actions their overwhelming bias in favor of CISFs, ever since Tony Hsia's incredibly inappropriate and predisposed pep rally cheer in favor of CISF licensing in late 2015.

72.    From New Mexico's point of view, it is noteworthy that the Japanese Parliament determined that the root cause of the Fukushima Daiichi nuclear catastrophe was collusion between regulator, industry, and government officials. It was the reason the three reactors, which melted down and exploded, causing a catastrophic release of hazardous radioactivity to the environment, were so very vulnerable to the earthquake and tsunami that struck them on March 11, 2011. Such dangerous collusion exists in spades here among the U.S., NRC (Staff, ASLB Panel, and Commissioners) and as it relates to Holtec and the Eddy-Lea Energy Alliance ("ELEA") and the proposed ISP CISF, immediately adjacent to the southwest New Mexico border.

73.    In addition to NRC's allowance of hypothetical CISF license provisions that violate its organic statutes and regulations or provisions that are based on pure conjecture without assessment, and the multiple fundamental misrepresentations by Holtec (such as its inferior property rights and alleged, but not existing, industry land use restrictions at and around the

proposed site, which opposing State and local agencies, as well as others, have exposed), the NRC has utterly failed to conduct an adequate independent investigation into the reliability or information under its review. The NRC's blatant disregard of the host State and major viewpoints of interested parties here, as required by law and the NRC's own NEPA-implementing regulations, is clearly improper and a testament to its lack of express authority and inability to evaluate the licensing of such an unprecedented facility under unknown and yet-to-be-determined conditions at the expense of the host State.[48] Instead of collaborating and cooperating with State and local agencies and communities, the NRC simply accepted, without independent review, the veracity and accuracy of Holtec's presentations. It is negligent at best, and certainly not protective of public health and safety, for the NRC to rely without question on information provided by a party with vested financial interests in both decommissioning sites and establishing the proposed CISF.

74.     Perhaps even more troublesome here is NRC's shielding of agency actions from outside review and scrutiny, as the NRC terminated the official proceedings and records for both proposed CISFs prior to publication of NRC's initial draft EIS documents, creating a heightened (nearly impenetrable) standard for interested parties to challenge NRC's conclusions and the information relied on in agency documents to make those determinations relating to the proposed CISFs. This shielding from scrutiny in proceedings for licensing a nuclear storage facility with conditions that violate NWPA and without independent investigation or adequate assessment of the external costs to communities, the environment and local economies in the Permian Basin, will cause irreparable harm to the host State of New Mexico and as such, warrants the declaratory and injunctive relief requested herein.

---

[48] *See e.g.,* 10 C.F.R. § 51.70(b)-(c) (requiring NRC's DEIS to "be concise, clear and analytic, . . . state how alternatives considered in it and decisions based on it . . . achieve environmental laws and policies . . . identify any methodologies used and sources relied upon . . . be supported by evidence that the necessary environmental analyses have been made . . . [and] *cooperate with State and local agencies to the fullest extent possible* . . .") (emphasis added).

75.     Given its lack of explicit authority and myriad of unknowns, the NRC chose to ignore its responsibilities under NRC and NEPA regulations, resulting in faulty, flawed and unreliable conclusions. In doing so, the NRC inappropriately passed over pertinent considerations and viewpoints of the Governor, New Mexico Environment Department ("NM ED"), the State Land Office, the New Mexico Energy, Minerals and Natural Resources Department ("NM EMNRD"), and other entities with extensive and superior regional knowledge of the proposed CISF, improperly discounting the overwhelming opposition by the Governor of New Mexico, senators and representatives, tribal nations, counties and cities and other interested parties of the region.

76.     For example, recent State Land Office and NM EMNRD statements revealing superior property rights at the proposed site and NRC's lack of notice to and consideration of oil and gas and mineral lessees in the region. In largely ignored oppositions to the proposed Holtec CISF, these State entities have pointed out that any resulting CISF limitations on local mineral extraction industries would reduce funding for indispensable regional infrastructure, including but not limited to, royalty payments funding public education.

77.     Yet NRC is inexcusably not concerned that CISFs will interfere local economies or with existing oil and gas operations and valuable mineral extraction operations (or that shallow level fracking activities might not be consistent with long-term storage of high-level radioactive waste and SNF). NRC likewise does not fault Holtec's misrepresentations and material omissions and lack of financial assurances in its licensing application, the NRC does not fault or find Holtec unsuitable to operate a high-level waste repository.

78.     Indeed, it is recognized in international standards and generally in the scientific community not to place nuclear facilities above valuable extractable mineral and energy

resources.[49]  But the first viewpoints to consider when attempting to site a nuclear waste dump in the middle of the Permian Basin should be nearby oil and gas lessees, given their importance to the State's economy and national defense, more specifically those with dominant property rights at and around the proposed site.  It is hard to imagine a more relevant or significant interested party, especially given the State Land Office's repeated and explicit objections.

79.    Yet, the NRC has largely taken Holtec's speculation and mischaracterizations of their collective land use rights and alleged land use restrictions at and around the site at face value, without conducting any independent review as to reliability of information of this highly relevant information.

80.    And, relevant to these public comment proceedings, NRC's behavior demonstrates flagrant bias in favor of the Holtec and ISP CISFs by failing to evaluate its substantial impacts. Impacts on not only the environment, but also public health, safety, security and the economy.[50]

81.    Such schizophrenic safety regulation and industry promotion imbalance is what led to the demise of the United States Atomic Energy Commission ("AEC") by the mid-1970s. Stringent safety regulation and unbridled industry advocacy are mutually exclusive, of course. NRC rose from AEC's ashes with the clear mandate to "protect people and the environment," as the NRC logo puts it. Most unfortunately, for the public interest anyway, DOE was given AEC's nuclear advocacy role, embodied in its unbridled Office of Nuclear Energy ("ONE"). NRC has

---

[49] IAEA recommends that nuclear storage sites or permanent *de facto* disposal sites, like the proposed CISFs, should be situated on adequately controlled, *single-use* pieces of land that are void of or be located away from known areas of significant extractable mineral, energy or other valuable resources. *See,* IAEA Safety Standards for Protecting People and the Environment, Disposal of Radioactive Waste - Requirement 9: Isolation of Radioactive Waste at 27 (2011); *available at:* https://www-pub.iaea.org/MTCD/publications/PDF/Pub1449_web.pdf.
[50] *See e.g.,* Holtec CISF NRC Presentation Slides (2020) (ML20225A100), *available at:* https://www.nrc.gov/docs/ML2022/ML20225A100.pdf), Ex. 6; *see also,* ISP/WCS CISF NRC Presentation Slides (2020), *available at:* https://www.nrc.gov/docs/ML2027/ML20274A035.pdf (all slideshows were nearly identical).

violated its mandate here. It has strayed very far into the policy setting and industry advocacy arena.

82.     The non-binding BRC on America's Nuclear Future, recommends CISFs, as stated in the BRC's January 2012 Final Report, but this came only after improper NRC lobbying. BRC was based on DOE" ONE. In fact, in the BRC's mandate, it was stated explicitly that BRC was to issue final recommendations on the so-called "solving the nuclear waste problem," so that the nuclear power industry could get along with its agenda of building new nuclear power industry facilities in the United States and overseas. Besides that blatantly promotional objective -- as opposed to the environmentally-, safety-, and health-protective -- agenda of DOE ONE's BRC, NRC has failed to follow BRC's recommendation of "consent-based siting," another BRC Final Report top tier recommendation. And neither CISFs have the consent of the host states, New Mexico and Texas.  Governor Michelle Lujan Grisham has written the NRC, expressing strong opposition and concerns over extended operations to Holtec's CISF.  Ex. 1. Governor Abbott has expressed similar forceful opposition in a letter to then President Trump. Ex. 7.[51]

83.     The Holtec location and geology is inescapably and unalterably unsuitable for the storage of high-level radioactive waste.

84.     For example, on December 10, 1961, a massive nuclear device in Project Gnome was detonated in the Salado Formation in southeastern Eddy County and southwestern Lea County. It is unclear if subsequent substantive consideration has been given to the lasting impacts of same, though it appears not.

---

[51] Texas Governor Greg Abbott Letter to then President Trump (Sept. 30, 2020) (noting the lack of State consent and that "[t]he proposed sites in Texas and New Mexico do not provide the deep geologic isolation required for permanent storage in order to minimize the risks of accidents, terrorism, or sabotage . . ."), Ex. 7.

85.     The Salado Formation is about 75% salt, although it contains extensive deposits of potash minerals which are mined at many localities and refined for potash fertilizer. Geohydrology of Project Gnome Site, Eddy County, NM, Geological Survey Professional Paper 712-A.

86.     Historical potash mining areas throughout the region have resulted in the heightened potential for sinkholes, karst development and substantial subsidence, in one area as much as 40 inches in past several years. Several experts believe the rapid sinking in this region is linked to dissolving salt layers in the Salado Formation.

87.     On June 19, 2019, the New Mexico Commissioner of Public Lands issued a letter to Holtec President and CEO attacking Holtec's CISF application.  The letter was docketed by the NRC on July 2, 2019.[52]  At the time, the Commissioner's letter pulled back the curtain on Holtec's misrepresentations to the NRC, claiming to have complete "control" of the proposed CISF site in New Mexico, alleged agreements secured from mineral lessees, and that its proposed CISF project enjoys "overwhelming support." To the contrary:

> . . .a number of New Mexico industry associations, from the New Mexico Cattle Growers' Association to the Permian Basin Petroleum Association, recently have expressed serious concerns about – and in some instances outright opposition to – Holtec's proposal. Along with elected officials and non-profit organizations, they have raised significant questions about the effect of the proposed nuclear waste storage site on New Mexico's oil and gas industry, farm and ranch economy, and environment.[53]

88.     The Commissioner's letter also exposed Holtec's complete disregard of the State Land Office's authority over the site's mineral estate at and around the proposed CISF site. And that Holtec and the NRC purposefully omitted or calculatingly shielded vital information regarding property rights, land use and land restrictions in its analyses, failing to disclose the reality of the

---

[52] See, Stephanie Garcia Richard (New Mexico State Land Commissioner) Letter to Krishna Singh (Holtec President and CEO), starting at p.2(July 2, 2019) (ML19183A429). Ex. 5.
[53] Id.

State's rights and authority in its licensing documents.[54]  Further misrepresenting the historical, present and reasonable future status of drilling depths and mineral extractions in the vicinity of the site and risks of subsidence.

89.    Holtec and Defendants have a duty and responsibility to provide truthful information in this context. It is paramount when dealing with the management of the nation's highly-radioactive waste that information is complete and accurate in all material respects to allow for proper site assessment, evaluation of the safety risks, environmental impacts, costs and benefits in light of alternatives considered.

90.    On March 10, 2020, the NRC made its DEIS for Holtec's license application publicly available.[55]  And shortly thereafter in May of 2020, the NRC published its ISP DEIS.[56] With respect to the CISF DEISs, NRC is tasked with conducting an independent investigation into the reliability of the evidence supporting licensing information to ensure its accuracy and completeness. On top of assessing environmental and safety risks, the NRC is also tasked with completing cost benefits analysis in light of the alternative options considered.

91.    As noted by the Association of American Railroads ("AAR"), the NRC has failed to account for or discuss the necessary infrastructure improvement costs to ensure railroads transporting the over-sized railcars of nuclear waste to and from the CISFs meet the AAR's "Performance Specification for Trains Used to Carry High Level Radioactive Material S-2043."[57]

---

[54] *Id.* .
[55] "Environmental Impact Statement for Holtec International's License Application for a Consolidated Interim Storage Facility for Spent Nuclear Fuel and High-Level Waste" (Draft Report for Comment), NUREG-2237 (Mar. 2020) (ML20069G420) (Holtec DEIS).
[56] Environmental Impact Statement for Interim Storage Partners LLC's License Application for a Consolidated Interim Storage Facility for Spent Nuclear Fuel in Andrews County, Texas, Draft Report for Comment, NUREG-2239 (May 2020) (ADAMS Accession No. ML20122A220), herein after "ISP DEIS."
[57] Association of American Railroads Letter to NRC (July 7, 2020) at p. 1.

Under NRC's approach, the CISF licenses go forward, even if such required upgrades are not made.

92.     Holtec's proposed CISF also requires construction of a rail spur, to accommodate the transport of bulky railcars carrying SNF and transfer of cask storage systems into the facility, on Bureau of Land Management ("BLM") land for which right-of-way approval has not yet been secured. The rail spur and facility would further require construction of a site access road and impose restrictions or disturbances on potash mining, oil and gas production and development, and livestock grazing.

93.     Any shipments of nuclear waste traveling to either Holtec CISF or the ISP CISF would inevitably travel through New Mexico along State railroads and/or roads not currently equipped to accommodate such dangerous and heavy shipments, which would disproportionately require tremendous State expenditures and further disrupt State industries presently utilizing its rails and roads.

94.     The NRC's analysis of costs and benefits (as well as other "vulnerabilities [that] remain") have been repeatedly criticized.[58] For example, pending GAO recommendations issued to the NRC, from years prior, to adopt "best practices" have remained open for years. NRC's own policies continue to keep pace with licensee applicants' motives but fail to evolve and are stale or unresponsive to federal government requests and Congressional intent. According to Defendants' March 2021 response, "[f]ollowing Commission review and approval, the staff will issue the final

---

[58] *See* U.S. Government Accountability Office ("GAO") Report, GAO-15-98, (Dec. 2014)  (finding the NRC needs to "revise[] its cost estimating procedures. . .and the NRC Chairman should ensure that the agency aligns the procedures with relevant cost estimating best practices identified in the GAO Cost Estimating and Assessment Guide and ensure that future cost estimates are prepared in accordance with relevant cost estimating best practices."); *see also,* C. Hanson (NRC Chairman) Letter (March 1, 2021) (responding the "NRC is **updating its cost-benefit guidance to incorporate cost estimating best practices and the treatment of uncertainty to support the development of more realistic estimates of the costs to implement proposed requirements**") (emphasis added).

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

29

[NRC guidance document (NUREG/BR-0058)] . . .and reference it [at some point in the future] on the NRC public website."[59]

95.     The NRC-issued guidance documents and associated updates concerning decommissioning costs and potential coverage for longer than expected and unauthorized "interim" storage are supposedly expected in the near future. Coincidentally, Holtec's outstanding responses to NRC issued RAIs relating to its final assurances for decommissioning funds to ensure the State is not left to pick up the pieces in the event that Holtec's house-of-cards business plans collapse or it becomes insolvent remain unanswered. The suspect timing of the NRC's request for such vital financial information and Holtec's refusal to provide same is par for the course here, evidencing collusion between the NRC and Holtec and disadvantaging and discouraging the public and interested parties, including the State, from meaningfully participating and providing opposing viewpoints.

96.     In rejecting and ignoring any potential opposition to the proposed CISFs, the NRC not only improperly withheld allegedly proprietary information, contrary to full public participation, but also allowed CISF applicants to delay crucial responses to NRC-issued RAIs, deemed necessary by the NRC itself in the license review process.  This has allowed Defendants to effectively create a shield from any outside scrutiny of the proposed CISFs. The consequences of such non-disclosures and unexamined answers are exacerbated here, in the heavily regulated business of high-level radioactive waste, which is not a competitive one.

97.     The NRC's actions preclude meaningful public participation and obscure the fiscal and technical decision-making processes. Consideration for the proposed CISFs is devoid of a legitimate assessment of the actual costs and benefits for the proposed CISFs, much like NRC's

---

[59] NRC, Summary of NRC Actions – Response to GAO Reports, (March 2021) at p.2.

deficient evaluation of cumulative environmental and land use impacts within the State, it turns a blind eye to the serious, significant and disproportionate burdens such CISF facilities would have on the economy and communities in New Mexico.

98.     As set forth in the Governor's Letter, Ex. 1, the proposed Holtec license would permanently damage the New Mexico economy.[60] "The remainder of the economy of the area is critically dependent on the oil and gas industry.  Oil-well drilling, oil exploration, oil industry services such as equipment sales and well servicing, provide the larger part of the income of the area." Geology and Ground-Water Conditions in Southern Lea County, NM, Groundwater Report No. 6, USGS.  "Stock raising, which once dominated the economy of the area is now of only secondary importance." Id.

99.     The thrust of NRC's actions here, the timing during a pandemic and the uncharacteristic expediency of CISF proceedings here is unprecedented. Given that NRC keeps changing the rules of the game and given the circumstances, interested parties cannot reasonably or meaningfully participate or contest the NRC's actions.

100.     The NRC's insulation of information, precluding public participation, limited number of in-person public meetings and its blatant disregard of major viewpoints, including any measure of consent from the State, in opposition to the extraordinary and unparalleled undertakings proposed by the CISFs are entirely improper, and Defendants' actions in proceeding with licensing the CISFs exceeds statutory and delegated authority, ignores Congressional intent, and pays no heed to NRC's own regulations and rules.

---

[60] See, New Mexico Governor Michelle Lujan Grisham Letter to NRC (Sept. 22, 2020) (ML20269A025), Ex. 1.

1. **State Opposition**

    A.    *New Mexico Governor Michelle Lujan Grisham*

101.    Noting the NRC's failure to address significant regional environmental and economic concerns, the likelihood of a permanent *de facto* facility, and the geological unsuitability of the proposed Holtec site given it is "underlain by concerns for sinkhole developments and shallow groundwater, a precious resource in [the] state," the Governor proclaimed the proposed Holtec project untenable.  And contrary to the fundamentals of consent-based siting, In September of 2020, the Governor further stated, in opposition to the proposed Holtec CISF that, contrary to the fundamentals of consent-based siting, "New Mexicans, tribes and local governments overwhelmingly oppose Holtec's . . . proposal and the issuance of an NRC license" given the "unfunded mandates on local communities." Ex. 1.

102.    In the Governor's words: "[e]stablishing an interim storage facility in this region would be economic malpractice" and "[a]ny disruption of agricultural or oil and gas activities as a result of perceived or actual nuclear incident would be catastrophic to New Mexico, and any steps toward siting such a project could cause a decrease in investment in two of [the] State's biggest industries." In sum, the proposed Holtec CISF "is fatally flawed based on a lack of due diligence by Holtec International, a lack of understanding of New Mexico's environment, and an insufficient analysis of potential impacts to our citizens and our economy." Ex. 1.  Holtec's fatally flawed project only moves forward because of NRC collusion.

103.    Without the consent of the Governor and legislature (and in the absence of explicit agency authority under the NWPA or AEA to license and in violation of the APA), the NRC and proposed Holtec CISF cannot go forward.

    B.    *Senator Steinborn*

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

32

104.    Noting the NRC's lack of adequate community outreach for the Holtec DEIS, the absence of a permanent disposal site, and significant risks and emergency liability to local communities, comments from Senator Steinborn, *et al*., in September of 2020, reinforce the notion that the proposed Holtec CISF project faces substantial regional opposition. Ex. 7. The major viewpoints expressed therein have not been considered or have been steeply discounted and undervalued in the NRC's licensing process:

- "We write to express our opposition to the proposed [Holtec] [CISF]. . .. ***This project creates unreasonable health, economic and national security risks for New Mexico and its residents.*** It would expose many communities to risks during the transportation and storage or high-level radioactive waste. We believe that the scope of the [NRC's] DEIS foils to adequately and reliably assess the risks of this unprecedented proposed project and the many technical variables that exceed national experience. Furthermore, given the impacts or shipping high-level radioactive waste across the country to New Mexico, we are very disappointed by the [NRC's] ***lack of appropriate adequate outreach and public engagement opportunities required by law***."

- Not only do many New Mexico communities oppose the proposal, Steinborn el al also notes significant opposition from the governor, the commissioner of public lands and a majority of New Mexico's congressional delegation. . .***local governments representing close to 50% of the population have passed resolutions opposing the [Holtec CISF] or the transportation of high-level radioactive waste through their communities*** . . ."[61]

The lack of transparency and recent comments evidencing a lack of support from State and local governmental entities is in stark contrast to the BRC's recommendations for consent-based siting of CISFs.

### C.    *The All Pueblo Council of Governors*

105.    The All Pueblo Council of Governors ("APCG"), representing 20 Governors of New Mexico's Pueblo nations, also strongly oppose the proposed Holtec CISF. In October of 2019, the APCG raised concerns relating to the transport of nuclear material across the country and the lack of resources for emergency preparedness, training and infrastructure on tribal lands.[62] The

---

[61] New Mexico Senator Jeff Steinborn, *et al.,* Letter to NRC (Sept. 22, 2020), Ex. 8.
[62] K. Chamberlain, *All Pueblo Council of Governors say no to nuclear waste storage,* NM POLITICAL REPORTER (Oct. 24, 2019), available at: https://nmpoliticalreport.com/2019/10/24/all-pueblo-council-of-governors-say-no-to-nuclear-waste-storage/.

APCG's opposition also highlights the lack of meaningful consultation with tribal governments on a project "that presents unimaginable risks to their communities, environment and sacred sites."[63] Ex. 9.

### D.   *The Tribal Radioactive Materials Transportation Committee*

106.    In opposition to the Holtec DEIS, the Tribal Radioactive Materials Transportation Committee ("TRMTC") expressed valid concerns that "[p]otential transportation impacts from shipments of [SNF] through tribal lands were not evaluated," further noting Tribes have not ceded any Treaty-protected rights that could be potentially impacted by such transport.[64] Ex. 10.

### E.   *Albuquerque, Bernalillo, Las Cruces, Jal, and Lake Arthur*

107.    Since 2018, several local governments within the State have also passed resolutions opposing the proposed Holtec CISF project. More specifically, New Mexico governmental entities have approved resolutions opposing the transportation of high-level radioactive waste and SNF fuel through their respective communities expressing concerns about the logistics and safety of such transportation, as well as the costs to clean up in the event of a radiological incident.[65] In discussing the Las Cruces resolution opposing the proposed Holtec CISF project, City Councilor Yvonne Flores aptly noted (what the NRC and Holtec outright deny): "There's always the potential for human error. There will be accidents."[66] Ex. 11. In response to ELEA's John Heaton claims that the Holtec project will bring only benefits, increasing and diversifying economic development in the State, Mayor Ken Miyagishima replied: "There's really no upside to Las Cruces. . .The

---

[63] A. Ortega, All Pueblo Council of Governors Press Release, *All Pueblo Council of Governors Opposes Largest Nuclear Waste Transport and Storage Campaign in Nation's History,* (Oct. 21, 2019), Ex. 9.

[64] Tribal Radioactive Materials Transportation Committee Letter to NRC (Sept. 22, 2020), Ex. 10.

[65] *See e.g.,* M. Hayden, *Las Cruces council votes down nuclear storage facility,* ALBUQUERQUE JOURNAL (July 26, 2018), *available at:* http://nonuclearwasteaqui.org/2018/07/

[66] *See e.g.,* B. Gumprecht, *Las Cruces City Council approves resolution opposing nuclear storage facility,* LAS CRUCES SUN-NEWS (July 24, 2018), *available at:* https://www.lcsun-news.com/story/news/2018/07/24/las-cruces-city-council-approves-resolution-opposing-nuclear-storage-facility-southeastern-new-mexic/830724002/, Ex. 11

downsides could be huge. . .[and] the project provide[s] no benefit to people outside [Eddy County and Lea County]."[67] Ex. 11.

### F.   *New Mexico State Land Office*

108.   The State Land Office and State property and mineral rights were blatantly ignored by the NRD, like the many other State and local agencies discussed herein with whom NRC failed to collaborate and consult, and whose major viewpoints were left by the wayside in the NRC's review of Holtec's license and its conclusions in the Holtec DEIS. The State Land Office claims that had the NRC conducted its own investigation it could have corrected and clarified the record. But neither the NRC nor Holtec ever attempted to coordinate with the State Land Office.  To the contrary, the NRC (and Holtec) have repeatedly and consistently excluded the State Land Office from discussions involving land use and alleged restrictions and agreements Holtec falsely claimed to have secured proscribing subsurface activity at and around the proposed site, all of which it has ultimate authority over.  And NRC further disregarded its opposition to the proposed CISF project and pleas for the NRC to "adopt the No-Action Alternative and not issue the proposed license to Holtec."[68] Ex. 2.

- ***Had the State Land Office been properly consulted as part of this process, it would have provided NRC staff with accurate information relating to the project site and existing and potential mineral estate activities.***
- Holtec claims that it "is in discussions with the New Mexico State Land Office regarding an agreement to retire potash leasing and minimum the proposed . . . project area," DEIS at 4-4, 5-24. This statement is false.
- Holtec has not been forthcoming about the possible conflict between nuclear waste storage and current or future oil and gas development at the Site. ***The International Atomic Energy Agency appears top share my and State Land Office Lessees concerns about the interaction between nuclear waste storage and preexisting oil and gas development on the very same tract of land***. In a 2007 publication. that agency explained that "[a]ny potential site will require an adequately controlled single-use land area to accommodate storage facilities," and that potential waste disposal sites should "avoid land with exploitable mineral and energy resources." International Atomic Energy Agency.

---

[67] *Id.*
[68] Stephanie Garcia Richard (New Mexico State Land Commissioner) Letter to NRC (Sept. 22, 2020). Ex. 2.

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

35

Selection of Away-From-Reactor Facilities for Spent Fuel Storage. A Guidebook. IAEA-TECDOC-1558 (Sept 2007) at 3.2.2 (pp. 23-24) (emphases added). ***Despite Holtec's assurances it does not appear that the company- or the NRC, through the critical analysis of the potential conflicts between nuclear waste storage and the vital economic activities that are already taking place on the Site.***

- In addition to exercising control over mineral resources at the Site, the State Land Office is entitled to access and utilize surface lands to facilitate mineral development: "[a]s holder of the dominate estate," a mineral owner "has the right to use the land, both surface and subsurface, absent an express limitation, as is reasonably necessary to enjoy" its property rights.  XTO Energy, Inc. v Armenta, 2008-NMCA-078, ¶ 10, 144 N.M. 212. ***The DEIS does not take any of these considerations into account, particularly the State Land Office's (and its lessees') right to access and utilize the Site's surface for mineral development purposes.***

- In addition, the proposed location, in one of the world's top producing oil and gas regions, ***could have an adverse impact on one of New Mexico's key economic engines.***

- ***The [NRC's] DEIS does not capture the full potential costs of the proposed project.*** It fails to consider the economic cost to the state and region if there were an accident that impacts the ability of companies to work in one of the most productive oil producing regions in the world.  ***Any production decline related to a work stoppage could be hugely detrimental to the state's finances, which is heavily dependent on oil and gas taxes and revenues, as well as local economies.  It also fails to recognize the potential negative revenue impact to the state's public schools if restrictions were put in place limiting mineral extraction at the Site.***

- Holtec has falsely claimed to have secured agreements from oil and gas operators at or around the site to restrict these activities, specifically assuring the NRC that oil and gas drilling will only occur at depths greater than 5,000 feet.  However, there are no such agreements containing these restrictions in place with oil and gas lessees at the project site or the State Land Office.  One agreement has been made with Intrepid Mining LLC, a potash mining company, but that agreement has not been approved, as required by that company's lease terms, by the New Mexico State Land Office ("State Land Office").

- NRC should be aware that ***Holtec consistently has misrepresented its prospective ownership and control of the Site.*** The DEIS incorrectly states that "the proposed project area is privately owned by the Eddy-Lea Energy Alliance LLC." DEIS at 2-2. While the surface estate is privately owned, the mineral estate remains the property of the State of New Mexico, held in trust and managed by the State Land Office.[69] This is not a technicality; there are real consequences that follow from Holtec's misrepresentations; ***despite the fact that the Site mineral estate is owned and held in trust by the State Land Office, the agency was not consulted by the NRC.*** See DEIS at iii, 2-29. Instead, the DEIS relies on incorrect and misleading statements made by Holtec that the State Land Office previously noted in its June 19, 2019 letter to the company and NRC (attached as Exhibit B).

- Holtec claims that its nuclear waste facility "will have no impact on oil and gas exploration and development in the proposed project area because extraction will … occur at depths

---

[69] The DEIS elsewhere acknowledges that "[l]and surrounding the proposed … project area is either privately-owned or owned by the BLM or the State of New Mexico …. The State of New Mexico owns the subsurface property rights within the proposed … project area." DEIS at 3-2. The DEIS' conclusions, however, are based on the incorrect assumption that Holtec (through ELEA, with whom it may have an agreement not disclosed in the record) controls the Site.

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

36

greater than 930 m [3,050 ft]." DEIS at 4-6. While oil and gas production frequently takes place in deeper formations, the DEIS simply assumes without discussion that no shallower development can occur now or in the future. State Land Office oil and gas leases, whose terms are prescribed by the New Mexico Legislature, do not impose any depth restrictions on oil and gas development.

- ***NRC's actions to approve Holtec's nuclear waste facility, as contemplated by the DEIS, thus could directly impair both the State Land Office's enjoyment of the full benefit of its mineral rights as well as contractual rights afforded to its oil and gas lessees.***

- Holtec does not own, lease, or have any control whatsoever over the development of the mineral estate. The State Land Office has active oil and gas leases in the project area, which contain provisions that are intended to facilitate the extraction of oil and gas resources and generate royalties for the public schools.

- Oil and gas operations are conducted as deemed appropriate by the lessees, as long as the activities are in accordance with the lease terms, State Land Office rules and Oil Conservation Division regulations. These leases are held by production and may remain active for decades to come.

- The State Land Office's oil and gas lease terms are set by statute and do not contain any depth limitations. By law and contract, oil and gas lessees are able to explore and develop resources at any depth. Even assuming the State Land Office desired to restrict mineral development to certain depths, it would be subject to potential lawsuits for conflict with the statutory lease. (See Exhibit A). Additionally, the [NRC's] DEIS does not consider what environmental and safety impacts might reasonably manifest if oil and gas operations did occur at shallower depths.

- Relying on statements made by Holtec, the DEIS finds that "construction of the proposed CISF would not have an effect on oil and gas operations within the proposed project area" and that the company "has no plans to use any of the plugged and abandoned wells." DEIS at 4-4. This determination is based on incorrect information and unfounded assumptions.

- As the DEIS notes, ***"potash mining is a major part of the Eddy and Lea County economies."*** DEIS at 5-24. Potash deposits in the immediate vicinity of the Site are considerable. Potash extraction takes place at depths shallower than 3,000 feet, DEIS at 3-9, so the DEIS' conclusion that mineral development at the Site will not be impaired by the nuclear waste facility because such development will occur deeper than 3,000 feet, DEIS at 4-6, does not logically follow.

- The DEIS recognizes that the project proposal may interfere with potash mineral extraction activities at the Site but views the impact as minor considering that there are other available resources in the region. ***This conclusion fails to consider that the State Land Office, as the trustee of the mineral estate, is obligated to get revenue from the mineral estate that it owns for the trust beneficiary assigned to that specific tract of land, in this case the state's public schools***. It does not matter that resources exist elsewhere, because the State Land Office's federal and state mandate is to generate money from all the lands it manages. The DEIS notes that potash demand is likely to increase over time with increased mining over the next 20-30 years, DEIS at 5-2, and with the potential potash resources at the site worth millions of dollars, abandoning the opportunity to develop these resources would result in a significant loss of revenue for public schools.

- Additionally, the EIS found that "Holtec has entered into an agreement with Intrepid to relinquish certain potash mineral rights to the State of New Mexico." DEIS at 4-4. This statement is misleading in several respects. ***First, any agreement to relinquish a State Land Office lease for the benefit of a third party would require the approval of the***

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

37

*Commissioner.* NMAC 19.2.3.18. This has not occurred. Second, if the lease were simply relinquished by Intrepid back to the State Land Office, the potash resource would again be subject to leasing by another company. Regardless, the approval of the Commissioner is legally required. As such, the safety and environmental assessments that have been conducted so far rely on the mistaken assumption that future potash leasing will not occur in the project area. ***NRC's conclusion that Holtec's proposal will have no meaningful impacts on potash development at the Site thus is premised on incorrec*** t or incomplete assumptions.

- ***State Land Office control of the Site's mineral estate is not limited to oil, gas, and potash, but encompasses all mineral resources, including caliche, sand, gravel, and other substances.*** See DEIS at 3-6 ("Mineral extraction in the area of the proposed … project area consists of underground potash mining and oil and gas extraction," and noting active State Land Office mineral leases). As the DEIS notes, the Site is located in an area of dense caliche deposits, DEIS at 3-4, 3-18, and nearby there is active sand, gravel, and quarry stone mining ***for various purposes, including roads and other infrastructure to support renewable energy projects in the area***. DEIS at 5-24, 5-25.

### G.    *New Mexico Environment Department*

109.    In addition to the NRC's glaring omissions of the major viewpoints of the Governor, regional governmental entities, and oil and gas lessees with dominant property rights at the actual proposed site, the NRC also abandoned its responsibility to consult and incorporate the major viewpoints and regional expertise of the New Mexico Environment Department ("NMED"). Like others discussed herein, NMED opposes the Holtec CISF project, "object[ing] strongly to the recommended action of approving the [Holtec] . . . [l]icense and demand[ing] the No-Action Alternative." Ex. 3. Recognizing the unlikelihood of a permanent repository in the near future, NMED commented in September 2020, that it feels "the proposed site is unsuitable for SNF storage over a period of decades" when only "burying highly radioactive and toxic SNF to a depth of . . . 50 feet in an area that is underlain by shallow groundwater and subject to concerns about ground subsidence and sinkhole development." Ex. 3. In comments to the NRC in 2019 and 2020, NM ED also raised issues with the lack of a requirement for groundwater monitoring and NRC's use of outdated seismic risk analyses. Ex. 3.

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

38

110.   Acknowledging that NMED is the expert on environmental impacts in the region and has highly specialized knowledge of hydrology, geology and local biology, the NRC entered into a Memorandum of Understanding with NMED to consult and collaborate on the Holtec DEIS; yet, their substantive comments and perspective has largely been ignored by the NRC as disclosed in their recently published opposition to the Holtec DEIS (noted below). Surprisingly, it was only recently in its October 21, 2020 released responses to NRC issued RAIs that Holtec first disclosed of its *intent* to file a notice with the NMED to obtain a stormwater discharge permit.[70]  In other words, the State environmental agency was not fully apprised, or even consulted, with respect to this necessary permit or of Holtec's intention(s), nor was the public able to comment on same at the time the Holtec DEIS was published. This lack of consideration for NMED's expert comments identifying technical deficiencies in the NRC's investigation, especially given the necessity of permits and permissions from State agencies before constructing the proposed Holtec project, is deeply troubling.

- *New Mexico has grave concerns about the inadequacy of the technical analysis* in the draft EIS. The inadequate conceptualization of the *geologically unsuitable site,* the preclusion of a thorough evaluation due to vast technical deficiencies, the *lack of inclusion of all applicable state regulatory oversite and environmental impact controls, and the omission of a full assessment of environmental justice concerns* all contribute to a draft EIS that *negligently fails to meet the requirements [of NEPA].*
- There are *at least 18 abandoned and plugged wells located on the property that could contribute to the formation of sink holes if the casing on these wells has been compromised.* There is one plugged saltwater disposal well located north-cast of the property boundary that could contribute to sinkhole formation and potential subsidence. Additionally, *ground subsidence related to potash mine workings, as has been documented in the region, must be evaluated in greater detail as a potential risk to the stability of the CISF facility.*
- The sources used for the seismicity section of the draft EIS *should include more recent research including the updated model of the reference used for the seismic hazard map and current seismic monitoring* by the Texas Bureau of Economic Geology TexNet project and the New Mexico Tech Seismological Observatory.

---

[70] *See,* Dennis McQuillan (New Mexico Environment Department, Science Coordinator) Letter to NRC (Sept. 22, 2020), Ex. 3.

{Cases; 00033519.DOCX}3/29/2021; 09:00:14
M:\TO FILE\Filing\Nuclear Reg Commission\2021.03.29 NM CISF Declaratory Action (626pm final edits).docx

39

- Any release of contaminants to shallow groundwater at the proposed Holtec CISF site is significant with regard to the potential for contaminants to migrate into water supply wells, springs and playas in the area . . . [and the NRC's Holtec DEIS] *does not contain any provision for groundwater monitoring. This is a critical omission given that shallow groundwater exists at the site; this groundwater must be monitored for any evidence of a release into the subsurface.*" (citing DEIS, 2017 ER and SAR, Rev. 1117 -all acknowledging the presence of discontinuous and variable-depth groundwaters at the proposed CISF site and the potential for shallow groundwaters in the vicinity that may he controlled by playa lake levels -such playas arc regulated surface waters of the state and subject to NMAC 20.64 (New Mexico's Water Quality Act))

- The draft EIS makes repeated, yet unsubstantiated, assertions that the Proposed Action will result in "no disproportionately high and adverse human health and environmental effects." *Given the geologic unsuitability of the proposed site, and the numerous other technical deficiencies* as discussed above however, the [NRC's] draft EIS *fails to demonstrate that residents of New Mexico, including vulnerable populations, will be adequately protected from exposure to the radioactive and toxic contaminants that could be released to air and water* by the Proposed Action.

- Holtec not included or proposed in Section 4.3.1.3 on Decommission and Reclamation Impacts any surety and warranty proposal to the State of New Mexico to ensure that site reclamations will be funded to the fullest extent. *If Holtec should experience financial challenges or unplanned setbacks, this could require New Mexico to fund and direct any remaining decommissioning and reclamation needed to protect its citizens and to restore the environment.*

## H.    *New Mexico Energy, Minerals and Natural Resources Department*

111.    Adding to the substantial oppositions from other State and local agencies and NRC disregarded viewpoints, the NM EMNRD also opposes and supports the "No Action Alternative," criticizing the Holtec DEIS and NRC's analyses for not complying with NEPA, among other inconsistencies and omissions, including failure to incorporate or even consider cumulative impacts to the oil and gas development in the areas and the substantial state revenues (nearly 40% of all New Mexico revenues) generated from oil and gas production taxes.[71]  Other issues identified by EMNRD in September 2020, include failures in "adequately describ[ing] the geological site," failures in "conduct[ing] a thorough evaluation because of numerous technical deficiencies" and most    importantly,    failures    in    "includ[ing]    all    applicable    state    regulatory    oversight    and

---

[71] According to the Permian Basin Petroleum Association, the proposed site would threaten executed contracts with the United States for operators who have invested in leasing the area for mineral exploration and development for oil and gas production.

environmental impact controls," as well as failures in "adequately assess[ing] environmental justice concerns" and recent increased seismicity concerns in the region.[72] Ex. 12.

112.     "The NRC [has] neglected its obligation to the public by not including the facts and data it used to determine that the impacts of storage at a government-owned CISF, alternative design and storage technologies, an alternative location. and an alternative facility layout would either not meet the purpose and need of the proposed project or cause greater environmental impact than licensing the Holtec facility." Ex. 12.

- *States and regional groups have consistently supported moving the fuel only once -from current locations to a national permanent repository.  Moving spent nuclear fuel multiple times increases the likelihood of accidents within the Stale or New Mexico and elsewhere.*
- The NRC completely failed to address known safety issues associated with transportation of spent nuclear fuel . . . [and also] *did not consider* the technical challenges in transporting spent nuclear fuel in any of the GAO reports, *the work the NRC engaged in with states and tribes in the Ad Hoc Working Group*, or the work conducted by the Western Interstate Energy Board (WIEB) High Level Radioactive Waste Committee (HLRW).
- The [NRC's] Holtec DEIS also *fails to recognize that the acts, of terrorism and sabotage do not simply impact the transportation safety of future shipments. but have huge impacts to communities, the environment. and soci[o]economic factors that should be included in the analysis*."[73]

## I.     *New Mexico Department of Homeland Security and Emergency Management (NM DHSEM)*

113.     Lastly and pertinently, the NM Department of Homeland Security and Emergency Management ("NM DHSEM") has also voiced strong opposition and does not consent to the proposed Holtec project and supports the "No Action" alternative, given the NRC's "fatal flaw[s]" in its regional analyses. And because the DEIS "fails to account for the lack of training and financial support for first responders along transportation routes and around the site."[74] Ex. 13.

---

[72] C. Bada (New Mexico Energy. Minerals and Natural Resources Department) Letter to NRC (Sept. 22. 2020) (ML20268C296), Ex. 12.
[73] *Id.*
[74] Bianca Ortiz Wertheim (Cabinet Secretary Designate NM DHSEM) Letter to NRC (Sept. 22, 2020), Ex. 13.

114.    As NM DHSEM aptly notes "no studies have been conducted by local agencies or officials with this type of information" and the NRC failed to engage with NM DHSEM "in planning or threat / risk assessments related to domestic terrorism, violent extremism, eco-terrorism / eco-protests or similar vulnerabilities for the Holtec Facility." Ex. 13.

115.    The NRC has not given any thought or consideration for "necessary funding for state and local agencies who would be required to monitor the safety of shipments and ensure public safety and confidence." Ex. 13.  Nor did the NRC recognize that NM DHSEM "lacks the staffing and financial resources to provide the appropriate level of support and independent oversight." Ex. 13.

## IV. CAUSES OF ACTION

### COUNT ONE
**Declaratory Judgment That Defendants Lack Regulatory Authority
to License or Conditionally License CISFs,
and Are Acting *Ultra Vires* in Conducting CISF Licensing Proceeding(s)**

116.    New Mexico repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

117.    In light of Defendants' actions in continuing to move forward with licensing Holtec's New Mexico CISF facility and ISP's Texas CISF facility, and the actual conflict between the parties that it creates, the Court is being asked to declare the rights of the State of New Mexico and the correlative rights, obligations and limits of Defendant's authority and such other necessary and proper relief as may be warranted.

118.    Neither the AEA nor the NWPA explicitly authorize either proposed "consolidated interim storage facility."

119.    Defendants are acting outside their designated authority, contrary to Congressional intent, constitutional constructs and explicitly delegated licensing authority.

120.    Defendants are without authority to violate the NWPA, including but not limited to, the NRC licensing of proposed CISF(s) under conditions that DOE take title to SNF prior to establishing a permanent repository.

121.    Defendants are without authority to violate NWPA, as well as NEPA, in NRC failing to adequately assess the cumulative environmental impacts and failing to internalize costs and benefits of the proposed CISFs to the detriment of the State. 42 U.S.C. §§ 4321 *et seq.*; 10 C.F.R. Part 51.

122.    Defendants are without authority to violate the APA and own promulgated regulations. 5 U.S.C. § 706(2). For example, the NRC's unjustified determination that the proposed "consolidated interim storage facilities," undefined under NRC regulations, are equivalent to an "independent spent fuel storage installation" and/or a "modified retrievable storage" facilities, and attempt to license proposed CISFs based on speculative future changes in the law and/or under conditions that violate the NWPA exceeds the NRC's statutory authority.

123.    Defendants are also without authority to license "consolidated interim storage facilities" of the proposed magnitude of Holtec's CISF in New Mexico, without adequately assessing the associated substantial impacts, risks, costs and benefits, without considering alternative options, and without the consent of the host.

124.    The term "consolidated interim storage facility" appears nowhere in the legislation creating NRC - nowhere in the Energy Reorganization Act, AEA, NWPA or NRC regulations. The type of facility to be licensed by Defendants within the State was created to promote the

growth of the nuclear power industry and to create a new policy option without Congressional authority.

125.    More specifically, the licensing of the proposed CISFs is contrary to the intent and violative of the policy imperative set forth in the agency's own organic statute, AEA, rendering Defendants actions *ultra vires*.

126.    Further, Defendants are without authority (or precedent) to grant multitude of decommissioning exemptions for license transfers to Holtec, with reckless regard for the financial assurances of proposed CISFs and future costs of the State.

127.    As such, the State asks the Court to find and declare that Defendants lack regulatory authority to license or conditionally license CISFs and that Defendants are acting *ultra vires* in conducting the CISF licensing proceedings.

128.    The State also asks the Court to find and declare that the proposed CISFs are not equivalent to ISFSIs or MRS facilities as defined in 10 C.F.R. Part 72 and are thereby contrary to NWPA and/or AEA, and are illegal.

129.    In conjunction with that ruling, which may or may not cause Defendants to stand down on CISF licensing, New Mexico also seeks a preliminary injunction.

## COUNT TWO
**Declaratory Judgment That Defendants Licensing of Proposed "Consolidated Interim Storage Facilities" Would Create Illegal and Unfunded Federal Mandates**

130.    New Mexico repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

131.    In the United States, unfunded federal mandates are orders that induce responsibility, action, procedure, or anything else that is imposed by constitutional, administrative, executive, or judicial action for state governments, local governments, and the private sector.

132.     Licensing of the Holtec CISF facility in New Mexico is predicated on Defendants decisions to place all costs of emergency response (*e.g.,* transportation, operation, training and equipping) on the State, Tribes and local governments, for an indefinite period of time, without prior Congressional authority, approval or compliance with the Constitution.

133.     Similarly, the licensing of ISP CISF facility on New Mexico's southwest border places disproportionate burdens of economic costs, emergency response, training and equipment on the State, Tribes, and local governments, for an indefinite period of time, without prior Congressional authority, approval, or compliance with the Constitution.

134.     The State asks the Court to find and declare that under the facts of the State's case, Defendants' licensing of proposed CISFs will create an unconstitutional and unfunded mandate on New Mexico.

## COUNT THREE
### Declaratory Judgment That New Mexico
### Retains Its Public Trust Interests in Holtec's Property

135.     New Mexico repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

136.     In the event that the Court does not grant the relief requested in Counts One and Two, the State asks the Court to find and declare the constitutional rights of the State pursuant to the New Mexico and United States Constitutions that the State manages the public trust it manages in the public interest, including but not limited to the economic utilization of its oil and gas and agricultural resources, among others.

137.     As such, the Court should declare that State rights, in this context and given the facts alleged herein, trump agency actions and actions of Defendants.

## COUNT FOUR

**Preliminary Injunctive Relief Suspending and Enjoining Defendants' Improper and Illegal CISF Licensing Proceedings to Prevent Irreparable Harm to New Mexico**

138.    New Mexico repeats and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

139.    The rules of statutory construction and interpretation clearly demonstrate that NRC lacks explicit or implicit authority to license the proposed CISFs.

140.    Congress did not delegate authority to NRC to unilaterally create unfunded mandates to the State or cause it irreparable harm as alleged herein.

141.    Because Defendants lack such authority and because the State is likely to succeed on the claims alleged herein and will suffer irreparable harm in the event the proposed CISF licensing proceedings progress, this Court should immediately suspend and enjoin any CISF proceeding.

## V.    PRAYER FOR RELIEF

WHEREFORE, New Mexico prays for relief as follows:

a.    On the First Cause of Action, New Mexico requests that the Court enter a declaratory judgment in favor of New Mexico and against the United States and the NRC;

b.    On the Second Cause of Action, New Mexico requests that the Court enter a declaratory judgement in favor of New Mexico and against the United States and the NRC;

c.    On the Third Cause of Action, New Mexico requests that the Court enter a declaratory judgment in favor of New Mexico and against the United States and the NRC; and

      d.      On the Fourth Cause of Action, New Mexico requests that the Court grant preliminary injunctive relief in favor of New Mexico and against the United States and the NRC, suspending and enjoining any CISF proceeding; and,

      e.      For all Causes of Action, any and all pre-judgment and post-judgement interest as allowed by law and all costs incurred as a consequence of having to prosecute this lawsuit, including any and all attorney fees; and New Mexico requests such other and further relief as the Court deems just and proper.

Dated: March 29, 2021

Respectfully submitted:

**HECTOR H. BALDERAS**
**NEW MEXICO ATTORNEY GENERAL**

*/s/   P. Cholla Khoury*
P. Cholla Khoury
William G. Grantham
Zachary E. Ogaz
Assistant Attorneys General
ckhoury@nmag.gov
wgrantham@nmag.gov
zogaz@nmag.gov
Post Office Drawer 1508
Santa Fe, NM 87504
(505) 717-3500